Case number 316-0355. People of the State of Illinois have to leave at 2 to Medivac v. Trayvion Moore, appellant at Stephen Burrell. Good to see you both, and are you ready? Please step up. Good morning, Your Honors. Counsel, I'm Steve Burrell with the Office of State Appellate Defender, 3rd District, for the defendant appellant, Trayvion Moore. May it please the Court, in this case, Trayvion Moore was convicted of two counts of aggravated criminal sexual assault, one count of aggravated lawful restraint, and one count of aggravated battery after a jury trial and was sentenced to 105 years in prison. In this appeal, I've raised three issues. First, that the trial court erred in denying defense counsel's request for a continuance. Second, that prosecutorial misconduct in opening statements and closing argument denied Trayvion a fair trial. And third, that Trayvion's sentence was unauthorized by law, where a 2010 amendment meant that the maximum aggravated consecutive sentences that could be imposed in this case was only 60 years. Hey, slow up. You sound like you're in the traffic report. Relax. Sir? Easier said than done. Yes. Well, you've got a lot to say anyway. We know that. There are a lot of issues, but, you know. Absolutely. And I intend to focus mostly on the first issue here. I may touch on the second if there's time to do that. I just wanted to give a brief overview there to make sure you knew what case we're talking about here. You didn't want us to forget what you were doing. No. We're fine. Okay. So, starting with the denial of the continuance issue. Obviously, this is a very serious case. My client was facing a de facto life sentence and, in fact, received it. The public defender in this case was handling this case on her own. And as the judge acknowledged, typically in Cook County, there would be two public defenders assigned to a case of this seriousness. And there were two prosecutors who were arguing against her. So she's outnumbered two to one, and the public defender's office is understaffed because of budget reasons. So she has to take on numerous cases while this case is pending. And the third trial date in this case was set for November 13, 2015. And, or sorry, November 16, 2015. On November 13, 2015, defense counsel moved for a continuance of that trial date. At that time, it was less than a year from the time that the 15-count indictment was filed in this case, which included 12 Class X felons. At that time, as the judge recognized, you know, there were other cases where not much really goes on after many months in a case. And this case, it turned out, was not one of them. And there's case law that shows that one year into a case, especially a case like this, is not a very long time. Trial counsel came in, and she clearly said she was unprepared for trial. The judge seemed to acknowledge many of her concerns. The judge actually said that the public defender's office, she told the chief public defender who was present at that hearing, that he should put someone else on the case to help her out. But at that point, it was three days before trial. So when the judge forced the case to trial three days later, even though he knew that she needed additional help, obviously three days was not going to be enough. He appeared to recognize that she was not ready. He also said that he would have granted the continuance if all he was considering was the interest of the defense. So clearly he recognized that there were compelling reasons for the defense to grant a continuance here. And some of the reasons that counsel gave included the need for a DNA expert, because she did not understand the DNA evidence in this case, and she needed someone to help her with that. She also said she needed to review the voluminous discovery material with Travian. And the judge acknowledged that it was reasonable for her to have that particular concern, in light of the fact that she had just been held to trial in another very serious case. She was obviously working hard, staying up until 9 p.m. at her office, working on this case, reviewing the voluminous discovery. Under the circumstances, it was arbitrary and unreasonable for the judge to deny the request for a continuance in this case. And if we look at another error in the judge's, what the judge did here, is that the judge failed to ask how long of a continuance that defense counsel was requesting. And the Illinois Supreme Court has, in the Walker case, mentioned that that usually militates in favor of finding reversible error. And that's really because it's impossible to exercise discretion as to the various factors that need to be considered if the judge does not ask how long a continuance is being requested. And here, a lot of the judge's concern seemed to be based on the fact that the complaining witness had medical issues and was going to be unavailable at certain points in the future. The prosecutor said that she anticipated having surgery in January or February. It's interesting that that didn't get nailed down a little bit more because, obviously, this was a scheduled surgery, and certainly it would seem a specific date could have been provided, which would have helped assist the court in determining this issue. But the state didn't do that. The state said January or February, and that suggested that with recuperation and potential additional treatments such as chemotherapy, the complaining witness might not be available until May or June of that year. Still, it seemed that there was no reason that the trial could not have been held in May or June. And... Didn't the elderly victim have a cancer diagnosis as well? I'm not sure if the record indicated exactly what her diagnosis was, but we can presume from the fact that chemotherapy involved that that was what was going on. Now, it should be noted that on April, the April date of Trillian's sentencing hearing, the complaining witness did show up in court at that point to give a statement. So there's some indication that she could have potentially testified at that time.  In other words, she wasn't dead then. That's correct. And the trial court doesn't have a crystal ball with somebody who's facing a diagnosis that requires chemotherapy. We all are living on borrowed time, and I think he had to balance the interests of the victim here as well. That's correct, Justice Wright. I mean, those are certainly legitimate concerns that needed to be taken into consideration here. However, as I pointed out in my briefs, one potential way, if you have a serious concern about the availability of the complaining witness that the judge did not seem to consider at all, was having an evidence deposition. And that could have been done by taking an on-scheduled trial date of November 16th, such that the complaining witness would not have been inconvenienced at all in this situation. And then it could have been presented at trial if necessary, or if she ended up being available unexpectedly, she could potentially still testify at trial. The evidence deposition would give a backup, essentially. Was that option presented to the trial court? It was not, and certainly that's a reason to question what defense counsel did a little bit here. But we do have to remember, she's exhausted. She's working on numerous other cases. She's not ready for trial. We all know what happens when people are stressed out and tired. Their brains don't function as well, and she may have missed this possibility. We would like it to have been pointed out, but unfortunately nobody suggested it. Well, the trial judge said she had just finished a case where it was very complicated to dwell on that case. Yes, absolutely. And that was November 2nd through the 9th, so it lasted for a week. I'm chuckling because we all know that you become a little foggy when you're tired. I'm guessing you prepared for arguments last night, probably late into the night. I was preparing until well past midnight last night to be prepared for this morning. So my point is you don't look ineffective to me. Where in this record that you have reviewed was the defense counsel ineffective? I know she was tired, but where was her performance deficient? Well, if we look at trials specifically, we can tell that some serious mistakes occurred and that she expressed concern that she didn't understand the DNA evidence, and it was clear that she didn't from her cross-examination of the state's expert because the state's expert, she questioned the state's expert about a technique that the state's expert, the DNA technique that the state's expert did not use in this case. The state's expert actually said that that was generations older technology than she used in this case. So we know pretty unequivocally that defense counsel did not understand the DNA evidence in this case. Was there an issue regarding identity that the DNA evidence was critical for? Yes, yes. And the state even specifically in its closing argument in this case said the DNA evidence was, quote, crucial. And that was because, in this case, the alleged perpetrator was fully covered in clothing from head to toe, and the complaining woman was unable to identify who that person was. She initially thought that it could be this other person, Cordell Watts, who was a person that she knew and who met the general description in terms of height and weight and race and that sort of thing. But she was unable to identify him, so the DNA was really the only thing that identified Travian as a potential perpetrator. And there was some evidence at trial that there was a stutter that came out in the DNA. What the state characterized, the state's expert characterized as a stutter in the DNA in this case. And as I discussed on pages 18 to 20 of my briefs, that is a reason that generally a defense expert should be gotten, because that could potentially be something that was misinterpreted by the state's expert. It could either be DNA of another person, or it could potentially be something that was exculpatory and said that the defense could argue reasonable doubt as to whether this DNA was Travian's at all. Or the state's expert could be right, that it was just during the PCR testing process, certain artifacts of the testing process can come in there. But the key is that there can be different interpretations on whether this is an artifact that should not be considered or whether this is something that should be considered. So Kelso was deficient in the cross-examination of the DNA expert. What other deficiencies are to be expected? Well, one particular problem that seemed to occur, and I think that may be related to the fact that she didn't have sufficient time to review the discovery with Travian prior to trial, is that there appeared to be a change in strategy that occurred right before the trial, and defense counsel was talking at one point about a consent defense. The defense was still going to be that the complaining witness was actually sexually assaulted, but by another person, but there was consensual sex at a time before that. During the trial, that was abandoned, and the defense became completely that there's reasonable doubt as to whether this DNA was Travian's. So that does make you wonder if, of course, the judge acknowledged that that was a real concern, that she didn't have enough time to go over discovery with Travian. And if you have enough time to go over discovery, that can really help get you on the same page as a defense attorney with the defendant, so that these sorts of things, last-minute changes in strategy, don't occur, and that you have no choice as a defense attorney as to whether the defendant testifies. So it's really important that you get on the same page with the strategy and allow the defendant to completely examine the evidence, including getting a DNA expert. I mean, that is also a thing that would help the defendant understand how to proceed at trial, whether to testify. She needs to get an expert just so she can advise him, if she doesn't understand the DNA evidence, on how we should proceed in this trial. So... But the trial judge was informed that the defense was consent and that the DNA theory had been abandoned when he was considering whether the containment should be allowed. How does that factor into your argument of whether the trial court abused his discretion? Well, the defense did make it clear that this so-called consent defense was a defense that Trayden was not the person who sexually assaulted the complaining witness. There was another person who committed the sexual assault. So the defense position was... So the serial rapist that you're... Yes. Okay. It could potentially be that... Thank you for pointing that out, Justice Wright. That was also another concern that the defense counsel had, was that she just got these police reports three days before trial, that suggested the possibility that a serial rapist committed this offense, and she wanted time to go over those as well. So... On a timeline, how long was the defendant in jail until trial? He was in jail the entire time, so it would have been about a year, a little bit over a year. And if he had requested his... Or if the trial counsel had requested his speedy trial demand, when would he have to be tried? It normally would be 120 days. The state does have the option of extending that in DNA cases because it's recognized that that can take more time, and I don't recall the exact number of days that the DNA extension is allowed for, but it would allow for more time.  It's pretty routine for defense counsel to waive speedy trial for most of the time, and that's what occurred here. Obviously, the defense wants time to prepare and needs that. And fortunately, you know, it's a sad fact that when you've gotten understaffed public defender's office, there's really only two options. The cases can take longer, or you can basically have a system where you're eliminating the effective sense of counsel. You're sending people to trial with attorneys who are not ready, unprepared, and you effectively could turn the courts into an assembly line just processing poor people into prison without them having the ability to present an adequate defense, without soaring between the innocent and the guilty. I have one follow-up question. I'm not picking on you, but first, my notes are... I want to thank you for the appendix that you included. Really, really, really helpful. There's two ways. We all know the trial judge had a difficult decision to make, a lot of important things to balance. So there's two ways to address the lack of time to prepare for defense counsel. One is to blame the trial court for making a mistake and not granting the continuance. The other is to seek a reversal based on the fact that you haven't raised the issue that defense counsel was ineffective. You've limited our review to whether the trial court abused its discretion. Won't you be able to raise an ineffective assistance of counsel claim later? The Post-Conviction Hearing Act does allow ineffectiveness of counsel claims to be raised in certain situations. However, it can be very difficult for the defendant to have to proceed pro se in order to do that. Then let me ask you this. Why isn't there an issue of ineffective assistance of counsel attributable to the lack of a continuance raised as a separate issue? Well, I think we could... think more and think if there's an angle for which to attack that, but... All right. I appreciate your honesty and your candor. So the answer that I'm going to process is it's my appeal, Judge, and I did it the way I did. Thank you for answering my question. Sir. So my time is up, but I'd be happy to answer any additional questions that you guys have. Did you want to finish a thought that you had? Oh. Well, I should just say that obviously we're requesting that this court reverse Trudy May's convictions and remand his case for a new trial. You want it reversed in all the things you raised? Yes. Both of the issues. And the third issue is a sentencing issue that I didn't think is covered in the briefs. So if you reach that, a new sentencing hearing would be the remedy for that. Thank you, Counsel. Thank you. Thank you, Officer. Counsel. May it please the Court. Counsel. We are here trying to determine whether or not the trial judge abuses discretion in the non-incontinent. Now, timelines are important. The timeline and all of this is one factor. I think what you also have to do is you have to look at what's underneath the timeline, what's going on. And by that, I mean, if I'm not mistaken, this occurrence happened around November the 10th of 14. So the defendant was in custody. A CODIS hit was made identifying the defendant. The defendant was arrested. He was then charged. The state got a vehicle swab. That was tested. And that came back identifying the defendant. So what we have is we have as of January, I believe, the 8th, is when the state, because the defendant had already been arrested in 14, had already been charged in 14, and so the state... And what time? When in 14? That's a whole year. Well, December. December. Okay. So a month later, the state produces to the defendant, gives them notification about the identification of the defendant through CODIS. Okay? A couple months later, in March of 15, they then give them notification of the identification done through the vehicle swab. And the test is compared with the victim's rape kit. Okay? So then in April 14th of 15, the defendant moved for a continuance, and that was granted in April. Okay? The date was set for August the 24th. On August the 18th, the state came in, and they filed the motion. Okay? And at first, defense counsel had no objection to this motion. And the reason given by the state was the fact that the victim was having a cancer treatment and needed time for that. The defendant personally objected at this hearing. He said, no, no, no, no. I don't object to this continuance. I want my trial on August. And so the trial judge had to balance that and decided to grant the continuance. So then on September the 15th... And there was no discussion about an evidence deposition. No discussion about an evidence deposition at all. No discussion about a request that I need a DNA expert. In fact, at this time, there was no indication of any kind of a consent defense or any kind of affirmative defense at all. There was nothing. So then on September the 15th, the people requested a trial date of November 16th, which defense counsel agreed to. And it continued to 11-15. On October 15th, about a month earlier, defendant filed a motion to continue the trial of 11-16. The reason given is it didn't want to put the victim to the difficulty or the physical difficulty and emotional difficulty associated with having to testify, given the fact that they had learned from Facebook that she was still having problems with cancer. The trial judge denied that motion. So now that brings us to November the 10th. On November the 10th... But that argument was good enough for the state to get a continuance vote, right? What's that? What argument? The complaining witness having cancer back in... when was it? When was that the argument for the state getting a continuance vote? That was the one that the... That was in August. That was in August. But it wasn't good enough for the defense. I mean, I'm just being simple about it. The trial judge... however the trial judge considered the matter and whatever was going on... Was it the same argument? The same argument based on the substance of cancer, but not because she needed treatment, not because of the fact that she was going in to be treated, but because of the fact that she had been treated, and apparently they thought that the stress of being able to... the stress of having to testify, etc. might be too much on her system. So they were trying to... Yes? They were trying to be kind. Treatment wasn't over at that time. I can't honestly say for sure. I had the impression that treatment wasn't over. I did not get... I know she was being treated. I know that later on, when it got to November, that's when they started making the comment about the fact that, well, she's going to have to now have surgery. So I'm not sure whether or not... Because I know some cancer treatments, they try to take and treat them to reduce the tumor before they do the surgery. Sometimes they do the surgery, then the chemo. There was no real... They were doing chemo. They were doing some sort of treatment for the victim. The victim was still being treated for cancer, regardless of the modality of treatment, in August and in October. November. It was November. Well... I thought, no. October, the defense gives the same argument to the court that the argument in August was made by the state. It was successful for the state, but not for the defense. Am I correct? That would be correct. But I think also at that hearing, I think it was also brought up with the fact that the victim was willing to take and still wanted to take and have the November date, wanted to testify nonetheless. That was the state's argument in response. That was, I think, their response. Because apparently they had contact. That's from my recollection of the record. November the 10th, there was a need for medical records. They wanted to get employment records. And all these motions, the 115-7 motion, was set for a hearing. So basically, in other words, there was motions going on. Defense counsel was operating and working to get the case ready for trial. Then November the 11th, they reviewed an earlier ruling. They allowed the defendant to use the medical records. And also, I believe, also allowed the 115-7 motion. Is there any dispute about the fact that these appointed public defenders in this county are overburdened and overworked? Is there a factual dispute one way or the other? Nothing was ever said on the record. So I would have to... Well, there's a lot of argument about being overburdened. On her part, I don't think the state, I don't think either of the prosecutors in this case said anything about the fact that, you know... Well, the public defender testified in front of the judge. Right, right. And acknowledged that there were changes in the office. And everybody was overwhelmed. And it seems that the trial judge was aware. Was aware of it. And so, no, there's no factual dispute about that at all. I mean, is there... The reason I'm asking that question is is there was testimony about that? Yeah. The state didn't make any contrary argument at all. So the evidence was a testimony. Yeah. Unrebutted. Unrebutted. The state didn't rebut that. The fact about the public defender's office? No. Okay, unrebutted. And that was in support of this particular defense attorney's argument about the... About the so-called being unprepared. Not having time to... And because of being overwhelmed with cases. Right. And having just finished the trial. Right. Okay? I think the judge said she did a good job, though. Yes. I mean, compliment her. I mean, you know... But then... Which speaks to diligence, doesn't it? Sorry? Which would speak to diligence in defending. It speaks to diligence in defending. It speaks to her to, I think, Justice Wright's question about ineffective assistance. About not being prepared. The diligence question comes in, though, with respect to DNA. Now, that was the heart of the November 13th request to continue. In reality, that was really the heart of what she was arguing. Or the basis for the motion to continue. That was... The DNA. That basically she wanted a point of DNA expert. Okay? Now, she did not articulate at that time the fact of this artifact. And not knowing what to do with it. Not knowing anything about it. She didn't speak anything about that. That really didn't come out until trial. In her cross-examination. But at this motion hearing, it was just... I need a DNA expert. I need somebody to help me interpret this. I need somebody to help do this. Well, I mean, you're saying this is the first time she talks about DNA. Correct. In any request for a continuation. In anything at all. But you don't have to... Are you suggesting she's making it up? No, I'm not suggesting she's making it up. What I'm just talking about is the question of diligence. The question of... She had the identification, the DNA identification, as early as January. As late as March. And we're now in November. Okay? And she's done all these other motions. She's done other things getting the case prepared for trial. Yet she never asks for a DNA expert. Are you saying she wasn't diligent? Yes. In making the request. Part of the whole thing with... Was she ineffective then, you're saying? No, I don't... To me, in this argument, are you saying she was ineffective? No, no. I'll come full circle in a second if you bear with me on it. So she wasn't diligent when she got... She wasn't diligent in asking for the expert. Okay? Because when you go to take and determine whether or not a motion to continue has been properly denied, there's just a whole slew of facts that you have to consider. There's not one particular fact. And I'm just going to brush on it real quick. Even not asking how long they need to continue once it's not, as a matter of law, error or an abuse of discretion. But the point here is the fact that she didn't ask. But also, she had just filed, in discovery, a consent defense. Now, a follow-along, she knew that the defendant's DNA was there and we had an expert. But she didn't take and ask for a DNA expert. And now, they're trying to take and come up with a theory to explain how it was, or how it is that the defendant's DNA is found in the victim's rape kit. And so, they come up with a consent defense. Now, we have a trial judge having to make a determination on whether or not to grant a continuance at this particular point in time. Judge Erickson says what? The most logical thing. Well, wait a second. If you're basically saying consent is a defense, in other words, your defendant had consensual sex with the state's victim. You're implicitly admitting the DNA, right? DNA becomes a non-issue. So, there's no need for an expert. So, it was all along the thought that consent was going to be. And, of course, now, where is counsel going to get the consent defense? Is counsel going to take and put her license on the line and just pick a defense out of the sky because it just happens to be something that will pick and talk about the DNA? I doubt that. Well, we can't speculate to the reasoning. We can only look at the facts. And the facts are the defendant basically had made comment about the fact that he had sex with her on particular days. The problem was, as the discovery later turned out, the day or days that he claimed he had sex with her, she was at work. So, the consent defense now is gone. Counsel has two minutes. Thank you. And so, what happens now is, is the fact that, now, do we now need a DNA expert to take and explain something or what have you? I'm a little bit concerned with the defense. And, in fact, my notes here indicate I got a trial date of 11-17. And I got the record site of R-375. And I wrote the cryptic note, defense was still consent. Defense affirmed during a sidebar related to the playing of a 9-1-1 tape during the testimony of the first listeners, which I think was Thomas Betterton. So, the thing is, consent was defense. Now, the fact that defense counsel, during the course of the trial, abandoned that, and the defendant never testified. The defendant never testified he had sex with the victim. The victim specifically testified, don't know him, never saw him, never had sex with him. So, the fact that defense counsel decided to jettison consent during trial can't be used to say the trial judge abused discretion. It's simply to say, well, because the fact that it's always been a defense and it wasn't a defendant, that doesn't work either. That just, that almost throws the baby out with the bathwater. In a sense, what I'm saying is, it's like, just because we've always said it wasn't the defendant, that because of that, that somehow, way, shape, or form, we should have been given a continuance in order to now prove that it wasn't the defendant's DNA based on what happened in trial, not based on what was going on at the motion. So, just like it covers everything, so it's almost like, it's almost like it's something that's irrebuttable. Just because you say he didn't do it, doesn't mean that you look at that and everything else that happens just gets thrown out. And then because we got that defense, that the defense is entitled to anything that they want. The way it does get thrown out, if they don't approach trial, if they abandon any consent defense and he's not testifying, or she testifies she's never seen this guy, the trial, that's what we're looking at here, the trial was about the identification of the person. Correct. When was the motion, when was the motion? The trial for identifying this defendant is the DNA. Correct. Okay, and that defense lawyer is saying, I really don't understand this one, this test that was done, right? I have no idea, I'm not an expert, and I need more time to develop this. Is a trial within a year a long time in this kind of case? I would say no. We've seen longer periods. We've seen longer periods, we've seen shorter periods. I mean I'm talking about this particular case. When you consider the victim, the fact of not knowing the defendant, the fact of the DNA evidence, the fact that there's nothing there, there's no consent defense, there's nothing that, when I say excluded, there's nothing here, okay, it is a, to me it's one of those similar kind of cases, it's just a clear cut case. Are you suggesting that when the state believes they have a strong case, the trial court is justified in accelerating the trial date? No, I'm not, I'm not saying. The presumption of innocence goes across the board. No, it does, but the thing is, you're talking about accelerating the trial date. I don't think the trial judge accelerated anything. The trial date was set, and what Your Honor is talking about. You're using that word now. I'm sorry. The thing is, you're talking about the trial, talking about what came out at trial. We're not talking about the sufficiency of the evidence. We're not talking about the adequacy of identification. What we're talking about is we're talking about a motion to continue that was made three days before the start of trial, that the trial judge had to decide. When he decided that, did he know that the defendant wasn't going to testify? Did he know that the consent defense had been withdrawn or was going to be withdrawn? In fact, there was no formal withdrawing at all. He didn't know anything. You have to judge what the trial judge did on the day he was called upon to decide that motion. That's all that I'm talking about, and that's what I think we have to focus on. Do you think the state went overboard? It was an argument to such an extent. No, I don't think so. Closing arguments have been the bane of my existence since I started working at the federal prosecutor's office. The reason for that is because, as you can tell, we're here before this court, and this is somewhat academia in a way. I, nonetheless, am somewhat divorced from the trial, divorced from the case. You can still see, I do get rather animated from time to time. It's the nature of the case. It's the nature of the business. It's the nature of being an advocate. Was this went overboard? This was not overboard. If you take a look at the context that everything was set, basically everything there is based on evidence, based on fact, and the state is allowed to take and present their theory of the case, and they are allowed to take and use the facts. They are allowed to take and put a little passion into what they're doing. It's not just something that is dispassionate. It's just, okay, we have facts one, two, three, four. Therefore, a jury find them guilty. It's not like that. Now, do you think that the sentencing statutes and how they're interrelated in this case, it's a complicated mess, and so it was errored with the trial? Not complicated at all. I mean, there's an approach that the defense raises, in part because of a footnote in some other case, a Rule 23 case, in fact, I think. Which is also kind of an interesting thing. I'm not sure what the court's stance is on us appellate counsel citing unpublished cases, either in footnotes or otherwise. But, of course, they're all published, too. Rule 23s are published. Unpublished, published. Yeah, unpublished. But they're only, they're, or they don't exist. In effect, they don't. But, and I just said that in passing, in part based on this comment that was in a Rule 23 case, but under an interpretation of the interrelationship between amendments and statutes that still stand and so forth. Right. I don't, I know what Your Honor is saying. I know what counsel is arguing. The thing is this. Simply because, simply because the legislature amends a statute does not always mean that they intend to, when I say change the law. Existing prior to this, the one provision referred to the aggregate maximum extended term for the two most serious offenses. And it did reference the extended term statute. Why? Because the extended term statute is the statute that had all of these specific years of the extended term. It was separate from the general sentencing provision. Well, I forget, it was a former, if I'm not mistaken, I believe it was a former appellate judge from the First District got together and they put everything together and now they got Article 4.5. Now in 4.5, under Class X sentencing, it's got the sentence for Class X is 6 to 30 and extended term is 30 to 60. Okay. And so what they just did is they simply took what had been in the extended term statute, now put it in 4.5. So they now had to change the other language to make the reference rather than to the extended term statute that no longer had any terms in it to 4.5. If you look at 4.5, and especially the Class X, what is the maximum sentence that the defendant can receive for a Class X? And that's the extended term sentencing provision. 60 and 60 is 120. He got 105. No problem. I mean, it's an interesting argument, the way, you know, on statutory construction and relationships. But at the end of the day... At the end of the day, if the legislature is simply correct in an oversight and still has the same intent, there's no indication that they at all intended to change that intent. To abandon what had always been there for years. Anything else, Your Honors? Thank you very much. Thank you, Counsel. Counsel? Okay. There are several points that I'd like to make with respect to what was just said. Starting with, I guess we'll start with the closing argument issue that was commented upon a little bit. I mean, what happened here was clearly not one prosecutor getting a little bit carried away. It was a plan. Two different prosecutors are saying very similar, very parallel stuff in the initial closing argument and the rebuttal closing argument. There's no doubt, unmistakable, intentional attempts to appeal to the jury's emotions in this case. Over and over, talking about the victim's family. In a case where the only disputed issue is identity. Talking about the victim's family. Talking about how it was a wonderful day when she never said it was a wonderful day. And now they're contrasting that with the brutality and humiliation and terror and horror of the offense. I mean, it's just, it's outrageous and shocking that they would engage in this. Obviously, the Supreme Court condemned a specific comment that Prosecutor Dickinson made as the rebuttal closing argument. And this isn't the first time that Your Honors have heard about these two particular prosecutors in Kankakee County doing this kind of thing. So really, it seems like this is what the Supreme Court created the precedent in Blue and Johnson for. Where you reverse, even if the evidence is overwhelming, because this kind of thing needs to be deterred and discouraged. And the only way to do that is essentially to grant a new trial. As to the issue of, there was discussion about the pretrial theory of consent again. And I think it's worth noting that, you know, there was a lot of evidence here that the complaining witness was sexually assaulted. That's one of the reasons, and not consensually, and that happened. That's one of the reasons the defense counsel felt that she could not necessarily challenge that. And they're looking instead at the DNA evidence in this case would have been crucial. Unfortunately, it seems the defense counsel didn't recognize it. But, I mean, if you have a consent defense that there's a consensual encounter prior to this, and then someone else comes and commits the assault, the one thing that is going to be almost essential, because it could be a difficult argument to win, is DNA of another person. Because otherwise, if it's just his DNA in the swab, then how's he going to win in trial? There were two tests for the DNA, right? Two major tests. There was, well, there's one vaginal swab sample. And so there's a sample from the defendant, and then a sample from the complaining witness that was tested against the two profiles. The State said that it detected from the vaginal swab. But if there's a stutter in the DNA in the vaginal swab, that could potentially mean that there's another person involved in this offense. What about the others? There's two. Oh, I believe that was the only test as far as, you know, there's one set of crime scene DNA. So there was a swab taken from the defendant to confirm that. And there was also a CODIS match. But the CODIS match presumably is the same thing that you're swabbing from the defendant. That's what I'm referring to. Yes, correct. But presumably, if those are the same, then the question is, if there's a stutter in the DNA taken from the vaginal swab, it could potentially be a stutter. Or it could potentially be the DNA of a second person. And it could potentially show that this wasn't his DNA at all. Also, I mean, it was- That's the better argument. Yes, that's the one that counsel made at trial, of course. And she, unfortunately, was not prepared to do so and said she was unprepared for trial. Obviously, she needed more time to think this through. The argument that the defendant was one of two doesn't get defense counsel anymore. But the argument of defendant was not the person. Yes. And while the one-of-two theory, there was some potential to that if there was DNA of another person found in the vaginal swab. Because the complaining witness had testified that she had not had sex with anyone within 72 hours of this occurring. So now if you've got a second man's DNA on there, that cast doubt potentially on her testimony about that. Right now, there's nobody else. There's not. So that's- And what we've got now is nobody else. I want to understand your argument. Your argument is the DNA could have shown that there was a second man in addition to defendant? Or it could have shown that the defendant was not the person who was involved in this at all. It could have been another person's DNA. But those are two different things that a defense attorney could potentially look at and discern that either there's a second person or there's only one person and it's not the defendant.  If we look at the point in time, as opposing counsel is suggesting, that's where we have to focus. At the point in time the trial court is considering whether or not to grant the continuance. All of this was well known by, what, April? Yes. That we have a DNA case here. Yes, I mean- Somebody is going to have to try to defend on the basis of finding fault with or confusing the DNA through an expert? Yes. The defense counsel probably should have realized that. But- The trial judge is faced with now a presentment that the defense is going to be consent. Right? But the defense is that it's another person who committed the offense. So the DNA is important to that. And obviously, with little foresight, you could think about the fact that the DNA evidence- We don't care about another person if your defense is consent. It's not the job of the defendant to find out who the other person is. It's just to make the state prove beyond reasonable doubt. Yes. Obviously, if there's another person- Yes, but it was consented to, which is not in conflict at all with an admission that there's nothing wrong with the DNA. That's why it's there. But the defense was always that it was another person who committed the sexual assault here. I mean, that was really- It was always that? Yes. I thought there was a consent defense presented to the trial court. When was that? Defense counsel explained, though, at the hearing on the motion to continue, that this- No, the last motion, dealing with I need more time for the DNA. Yes, the November 13th motion. Defense counsel clearly explained at that time that, yes, she had filed this consent defense, but what she was actually talking about was another person committed a sexual assault. And that was always the theory, is that someone did commit a sexual assault against the plaintiff's witness. That was not the defendant. And so the prior consensual encounter could have explained, potentially, the defendant's DNA, but it didn't necessarily explain why the victim was found bound, naked, and with injuries and that sort of thing. So the theory was always that, okay, this could explain the DNA, but there was someone else who came and committed the sexual assault. And if you don't have the DNA of this other person, then that's going to be really tough. If you've got a second man's DNA, and it would be easier to argue, well, she said she didn't have consensual sex with anybody, but there's two men's DNA on here. Why is that? Maybe you've got an issue. How explicit were they in presenting the consent defense? I mean, it is a verbal situation where the defendant was found, and how the defendant was found, right? Yes. I think it was made very clear by defense counsel at the hearing on the motion to continue. It's somewhere in page 300-something, early 300-something in the report of proceedings, when defense counsel explains that that's what the defense is and that it's more complicated than just that this was just a consensual encounter. There's more to it. I think in terms of some of the points about ineffectiveness in the counsel or defense should have sought the DNA expert earlier, well, I explained some reasons why, obviously, the overworked and tired and that sort of thing. But I think it's also important to recognize that, as the Supreme Court has said, evaluating whether a continuance should be granted is not just about the judge's discretion. It's also about the defendant's right to a fair trial. So it's essential that a judge consider the defendant's right to a fair trial in this situation. And sometimes that trumps even if defense counsel should have done something a little bit better. It doesn't matter. You cannot send him to trial with counsel who is unprepared and is clearly not ready. We can tell from everything that we've discussed here today that she obviously was not ready for this trial. There can be really no doubt about that. So forcing the case to trial three days later is absurd. And the defendant has the right to go to trial with the effectiveness of the counsel. He was denied that here by the judge denying the request for a continuance. You asked a previous question by Justice Wright with regard to what do you pinpoint during the trial that is an indication of an incompetent attorney. Yes. So we saw some indications in the defense cross-examination of the state's expert witness again. For example? So one of the examples was that she cross-examined the state's expert witness about a DNA testing that she did not perform in this case, about interpreting band patterns. And the defense expert said, I didn't perform that kind of testing. That's a generation's old technology that I would have used in this case. I mean, clearly she does not understand the DNA evidence that she's even asking that sort of question. And the stutter is another thing. She did not use that talk. She never argued to the jury that that created a reasonable doubt. And this is very troubling, obviously. If she had had a defense expert, things could have been considerably different, potentially could have gotten testimony from a defense expert that was supportive, would help create a reasonable doubt in this case. Do we have to really go into this? Are we really trying on your first issue to determine at the time the decision was made, was it an abuse of discretion? And what was known to the judge at that time in balancing a fair trial versus the interest of justice for the people? Well, here it was certainly an abuse of discretion. In some situations, the defendant's right to a fair trial is going to trump some other things. And, again, we have to remember that the judge didn't ask how long a continuance was requested. And a continuance of up to six weeks could have been granted without even getting into January when the complaining witness was going to have surgery. Does the judge have an obligation to ask, or does the defense counsel have an obligation to tell, I need six months, I need 30 days? Where does that blame fall? The Illinois Supreme Court has talked about the fact that a judge failing to ask is something that strongly mutates into a reversible error in the Walker case, and cited another case for that proposition. And I can follow up with one other question. Assuming that we agree with you that defense counsel was not prepared, are we creating a slippery slope and encouraging this argument to be presented in every court room, to every judge, three days before the jury trial, that defense counsel is not prepared? Because I can imagine if that is our decision, the pattern of requesting continuances will change. Well, I think, obviously, defense attorneys are officers of the court, and it's not a small thing for them to go in there and represent that they're not prepared to trial if that is false. That's not something that they're allowed to do. Well, assuming that it's true that they're not prepared, there's a lot of reasons for not being prepared. They just aren't doing their job. They've been on vacation. But that argument standing alone, I am concerned that it creates a slippery slope if we require the trial judge to weigh that consideration. Well, I would say that this case would be distinguishable from those cases where defense counsel is just, you know, going on vacation and not working on the case. I mean, here the judge specifically found that she was working hard on this case. She had done more work than it happened. In other cases, he suggested there were other cases where not much has happened at this point. And he acknowledged that she had done a lot of work in this case. There's no question she was working hard. The overburdened public defender's office is a major factor there, too. Again, as Justice Carter pointed out, it's undisputed, and Justice Holdrich, I believe, also. There's no dispute about that. I appreciate your answer. Thank you. Sure. Okay. Yes. Yeah, I would just say, if I could comment briefly on the sentencing error that was brought up. Just very briefly. Yes. Okay. So, an interesting point about the amendment to the statute. Obviously, it didn't happen at the same time that some sections were moved around. It happened later. And one additional interesting thing there is that, looking at the plain language of it now, the 582 would now authorize a sentence that's greater than the extended term range, because that's what it would say if you agreed with the State's interpretation now. So, interpreting that way doesn't seem to make any sense, and the only logical way to interpret it. If the conviction stands and you're right on sentencing, what would be the sentence? Remand for re-sentencing. The remedy. The remedy. What would be the range of sentence? 12 to 60. 12 to 60. That's correct. And how old is the defendant? 27. Okay. And you've got Max under the erroneous, right? I'm sorry? Under the erroneous. You're arguing the erroneous application of the statute that court gave the maximum sentence, right? Give him a little bit under. Give him 105 years. Not all that's at 100%. 100% versus 120? There's some 85% there, but yes. Okay. If there are no additional questions, I think this is court time. Thank you. The court will take this matter under advisement to grant your decision.